UNITED STATES, Appellant,

v.

Frank CLARDY, Specialist Four U.S. Army, Appellee.

No. 40,037.
CM 439171.

U. S. Court of Military Appeals.

July 12, 1982.

For Appellant: *Captain Thomas E. Booth* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Captain Paul G. Thomson* (on brief); *Major John T. Edwards, Captain Paul K. Cascio.*

For Appellee: *Captain James McAtamney* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Elliot J. Clark, Jr.* (on brief); *Major Raymond C. Ruppert.*

*Opinion of the Court*

EVERETT, Chief Judge:

On January 17, 1980, appellee was convicted, in accordance with his pleas, of five specifications of larceny, five specifications of forgery, two specifications of making and delivering a worthless check, and three specifications of making and uttering a worthless check, in violation of Articles 121, 123, and 123a, Uniform Code of Military Justice, 10 U.S.C. §§ 921, 923, and 923a, respectively. The military judge sentenced him to a bad-conduct discharge, 2 years' confinement, total forfeitures, and reduction to the grade of E–1. The convening authority suspended execution of that portion of the confinement in excess of 8 months but otherwise approved the findings and sentence.

On October 31, 1980, the United States Army Court of Military Review set aside

the findings of guilty on the two specifications of making and delivering a worthless check, because it concluded these offenses had been committed shortly before appellee had been discharged from a prior enlistment for the purpose of immediate reenlistment and were not in the category of offenses as to which military jurisdiction was preserved by Article 3(a), UCMJ, 10 U.S.C. § 803(a). *See United States v. Gallagher,* 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957). Pursuant to Article 67(b)(2) of the Code, 10 U.S.C. § 867(b)(2), the Judge Advocate General of the Army thereupon certified to this Court the following question:

WHETHER THIS HONORABLE COURT SHOULD MODIFY ITS DECISION IN *UNITED STATES V. GINYARD,* 16 U.S.C.M.A. 512, 37 C.M.R. 132 (1967), SO THAT COURT-MARTIAL JURISDICTION WILL EXIST TO TRY A MEMBER OF THE SERVICE FOR AN OFFENSE OCCURRING DURING HIS PRIOR ENLISTMENT WHEN HE WAS DISCHARGED SOLELY FOR THE PURPOSE OF REENLISTMENT AND HIS MILITARY STATUS REMAINED UNINTERRUPTED.

I

In his famous treatise[1] Colonel William Winthrop discussed the termination of amenability to military jurisdiction in this manner:[2]

It is the *general rule* that the person is amenable to the military jurisdiction only during the period of his service as an officer or soldier. Thus, in the case of an *officer,* the jurisdiction commences with the acceptance of his appointment or commission, or, where originally appointed by State authority, with his muster, (or re-appointment,) into the service of the United States, and ends with his death, the acceptance of his resignation, his dismissal, &c., or—if a volunteer officer—his discharge or mustering out, &c.

In the case of a *soldier,* it begins with his enlistment or muster into the service, and ends with his discharge or muster-out. In other words, the general rule is that *military persons*—officers and enlisted men—are subject to the military jurisdiction, so long only as they remain such; that when, in any of the recognized legal modes of separation from the service, they cease to be military and become *civil persons,* such jurisdiction can, constitutionally, no more be exercised over them than it could before they originally entered the army, or than it can over any other members of the civil community.

As to "Jurisdiction After a Second Appointment or Enlistment," he commented:[3]

It remains to refer to the effect, *per se,* of a subsequent appointment or enlistment of an officer or soldier, (once duly dismissed, resigned, &c., or discharged) upon his amenability to trial for an offence committed prior to such discharge, &c., (and within two years), but not yet made the subject of a charge or trial. Upon this point there is not known to have been any adjudication. Putting out of the question the class of offences, the amenability for which is expressly defined by the 60th article, it is the opinion of the author that, in separating in any legal form from the service an officer or soldier or consenting to his separation therefrom, and *remanding him to the civil status at which the military jurisdiction properly terminates,* the United States, (while it may of course continue to hold him liable for a pecuniary deficit,) must be deemed in law to waive the right to prosecute him before a court-martial for an offence previously committed but not brought to trial. In this view, a subsequent re-appointment or re-enlistment into the army would not revive the jurisdiction for past offences, but the same would properly be considered as finally lapsed.

1. W. Winthrop, *Military Law and Precedents* (2d ed. 1920 reprint).

2. *Id.* at 89 (footnotes omitted).

3. *Id.* at 93 (footnote omitted) (emphasis added).

Of course, Colonel Winthrop's remark above about "separating in any legal form from the service an officer or soldier or consenting to his separation therefrom, and remanding him to the *civil status at which the military jurisdiction properly terminates*" would be consistent with a view that, where a servicemember is discharged prior to the expiration of his enlistment for the specific purpose of immediate reenlistment,[4] he is never remanded "to the civil status," so he can be tried for offenses committed in the earlier enlistment.

Commencing with the period of World War I, there were holdings to this effect. *See, e.g., United States v. Johnson,* 10 B.R. 213 (1939); *United States v. Joly,* CM 149937 (1922); *United States v. Warz,* CM 145710 (1921); *United States v. Rosenberg,* CM 121586 (1918); *United States v. Brigham,* CM 104677 (1917). As the Board of Review stated in *United States v. Joly, supra,* unpublished opinion at 8:

The accused, as lieutenant colonel in the emergency forces, was discharged on September 23, 1920, "to accept appointment in the Regular Army." The next day, September 24, 1920, he accepted appointment as major in the Regular Army and there was no interruption in his pay by reason of his discharge (R. 25, 27, 28). It has been repeatedly held, in parallel cases where there was no interval of time during which the accused was separated from the army, that such a discharge does not relieve from liability to trial by court-martial for offenses committed prior to the discharge (See C.M. No. 145710, *Schwarz;* C.M. No. 149318, *Turner;* J.A.G. 250.451, Bender).

The Board of Review is, therefore, of the opinion that the plea to the jurisdiction should not have been sustained as to either charge or any specification.

Consistent with these cases, paragraph 10 of the Manual for Courts-Martial, U.S. Army (1928),[5] provided:

In certain cases, where the person's discharge or other separation does not interrupt his status as a person belonging to the general category of persons subject to military law, court-martial jurisdiction does not terminate. Thus, where an officer holding an emergency commission was discharged from said commission by reason of acceptance of a commission in the Regular Army, there being no interval between services under the respective commissions, it was held that there was no termination of the officer's military status, but merely the accomplishment of a change in his status from that of a temporary to that of a permanent officer, and that court-martial jurisdiction to try him for an offense (striking enlisted men) committed prior to the discharge was not terminated by the discharge.

If, on the other hand, the servicemember had received a discharge after he had completed his actual, obligated, term of service, or had received any other discharge that unconditionally released him from the service, the Boards of Review were then holding that court-martial jurisdiction had been permanently lost over offenses committed prior to such discharge; this was true even though the person later might have reenlisted.[6] *See, e.g., United States v. Sierer,* 11

---

4. This type of discharge is now often referred to as a "short-term discharge"—*i.e.,* a discharge given to a servicemember even before he completes his obligated term of service, which is granted for the mutual convenience of the servicemember and the Government in order to allow him to reenlist immediately and thus remain on active duty.

5. The Manual for Courts-Martial, U.S. Army, 1949 also contains this provision (para. 10). The Manual for Courts-Martial, 1921, did not contain such a provision but did recognize (para. 38) that, "The jurisdiction of courts-martial over officers, cadets, soldiers, and other

persons in the military service of the United States, ordinarily ends when they become separated from the service," and then sets forth certain "exceptions to this general rule." *Accord,* para. 38, Manual for Courts-Martial (1917).

6. Of course, there were a few exceptions to this rule. As the Board of Review observed in *United States v. Joly,* CM 149937, unpublished opinion at 8 (1922); and in *United States v. Warz,* CM 145710, unpublished opinion at 5 (1921), the 94th Article of War specifically provided for jurisdiction over certain fraud offenses even though the soldier had been dis-

B.R. 325 (1943); *United States v. Mankiewicz*, 5 B.R. 9 (1933); *United States v. Africa*, 3 B.R. 329 (1932); *United States v. Conyers*, 3 B.R. 227 (1932); *United States v. Finnimore*, CM 171874 (1926). In other words, if at any time the soldier actually left the service following his discharge, he could never be tried for offenses committed prior to his discharge, even if he subsequently returned to the service. Unquestionably, this became the established "general rule" which controlled the exercise of court-martial jurisdiction.

In 1949, in *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621, the Supreme Court, reversing the Court of Appeals, ruled that a sailor who had reenlisted the day after he had been honorably discharged from the Navy upon completing his first enlistment was not amenable to trial by court-martial for offenses committed before his discharge. In reaching its decision, the Court stated that it gave "great weight" to "the manner in which court-martial jurisdiction has long been exercised by the Army and Navy." 336 U.S. at 216, 69 S.Ct. at 533. Moreover, the Court relied upon what it termed a "long-standing Army and Navy interpretation" that, under the statutes applicable to these services, military jurisdiction did not exist under such circumstances, *id.* at 217, 69 S.Ct. at 533; and it concluded that before 1932 "both Army and Navy had for more than half a century acted on the implicit assumption that discharged service men, whether reenlisted or not, were no longer subject to court-martial power." *Id.* at 218, 69 S.Ct. at 534.[7]

Of course, this statement was only partly true, since the "long-standing" military practice seems to have permitted courts-martial in cases where the accused, despite having been discharged, had remained in continuous and "uninterrupted" active service without any return to civilian status. Para. 10 of the 1928 Manual for Courts-Martial, and of Manual for Courts-Martial, U.S. Army, 1949; *United States v. Brigham* (1917); *United States v. Rosenberg* (1918); *United States v. Warz* (1921); *United States v. Joly* (1922); and *United States v. Johnson* (1939), all *supra*; *United States v. Aikins*, 5 B.R.-J.C. 331, 379 (1949). Indeed, as the Board of Review had stated in *Johnson*, "The criterion is not the mere fact of discharge but the termination of military service." 10 B.R. at 216.

Congress exhibited considerable dissatisfaction with the perceived practical result of the *Hirshberg* case, whereby a former servicemember who had committed even a serious offense prior to being discharged might escape prosecution in *any* American tribunal. That the *Hirshberg* decision actually prompted Congress to enact Article 3(a) of the Uniform Code—which greatly extended the reach of court-martial jurisdiction—is made perfectly clear by the Article's legislative history. *Cf. United States v. Gallagher, supra.*

Even at the very first hearing on the adoption of the original version of the Uniform Code of Military Justice, which was held before Subcommittee No. 1 of the House Armed Services Committee on March 7, 1949—only one week after *Hirshberg* was decided—the decision was castigated by Professor Morgan and Congressman Elston

---

charged and had already left the service after completing his full term of service. *See also* paragraph 38 of the Manual for Courts-Martial, 1921, which provided:

    (a) If any person, being guilty of any of the offenses of fraud, embezzlement, etc., against the United States, while in the military service of the United States, receives his discharge or is dismissed from the service, he shall continue to be liable to be arrested and held for trial and sentence by a court-martial in the same manner and to the same extent as if he had not received such discharge nor been dismissed (A.W. 94).

7. The Court cited Colonel Winthrop's discussion of "Jurisdiction After a Second Appointment or Enlistment," 336 U.S. 210, 216–17, 69 S.Ct. 530, 533, 93 L.Ed. 621 (1949), but did not refer to his discussion of the general rule as to termination of jurisdiction. As noted earlier, it can be argued that where there is a "short-term discharge" and immediate reenlistment, jurisdiction continues as to offenses during the first enlistment because the servicemember never terminated his military status.

as an egregious misinterpretation of congressional intent:[8]

Mr. Elston. I would like to ask you this question. I think it was since you completed your hearings that a case has been decided by the Supreme Court of the United States.

Dr. Morgan. The Hirschberg [sic] case?

Mr. Elston. Yes. To the effect that a person who has left the service, that is, who has been separated from the service, cannot be tried subsequently by a military court for an offense committed prior to such separation.

Mr. Kilday. Even though he has reenlisted?

Mr. Elston. Even though he has reenlisted.

Dr. Morgan. That is right.

Mr. Elston. Now, you have not anything in your bill covering that?

Dr. Morgan. One thing we have about that is in the case of desertion. If he has deserted in the earlier service, then the fact that he has been discharged from a later service does not deprive the court of jurisdiction.

Mr. Elston. Yes. He may have even committed a murder within 3 days of his separation from the service.

Dr. Morgan. That is right, We have not covered that.

Mr. Elston. He reenlists and cannot be tried for it.

Dr. Morgan. That is right.

Mr. Elston. I think this committee can write something into the law that will take care of that ridiculous situation.

Dr. Morgan. Of course, *the Supreme Court put it on the basis of the interpretation of the present statute, as I remember it, and that is that Congress did not intend to have the jurisdiction exercised over the man after he had once been discharged.*

Mr. Elston. *Well, I do not think Congress ever intended anything of the kind.*

Dr. Morgan. *I know, but that is what they said.* There was not anything in the statute which saved the jurisdiction, and, of course, they interpreted it that way. Hearings on H.R. 2498. Before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., Index and Legislative History, Uniform Code of Military Justice, p. 617 (1949) (emphasis supplied).

Later, Colonel Frederick Bernays Wiener, in the course of discussing court-martial jurisdiction, further criticized the *Hirshberg* result (*id.* at 800):

He was a naval chief charged with mistreating American fellow prisoners in the Philippines. His term of enlistment expired in March '46; he was given an honorable discharge; reenlisted the next day, and thereafter his offenses came to light. The courts held there was no jurisdiction to try him after his reenlistment. So, in effect, they gave the honorable discharge which was issued by a 2½ striper at the Brooklyn Navy Yard, who, of course, couldn't know what Hurtzberg [sic] had done in the Philippines, in effect, as a pardon. The courts specifically said there was no constitutional question. I think that ought to be buttoned up.

Even during the third week of hearings on the Uniform Code, the subcommittee was still concerned about the possibility that—as put by Mr. Elston—"[a] man might commit murder the day before his term of enlistment was up and step out of the service and could not be prosecuted." In pursuing this point further, Mr. Felix Larkin, Assistant General Counsel of the Department of Defense, queried the committee as to "whether you can abide, missing the few cases of that kind, or whether there should be provided across-the-board jurisdiction for people who do not reenlist

---

8. Professor Edmund M. Morgan, Jr., represented the working committee which had drafted the legislation at the request of the Secretary of Defense. While Mr. Elston was not a member of the House subcommittee which considered the Uniform Code, the Chairman of the House Armed Services Committee invited him to sit in with the committee since he had long been active in the field of military justice.

and are not Reservists." Thereafter, Congressman Brooks suggested that they could solve this jurisdictional problem by adding "a very simple provision for jurisdiction to attach as of the date of the commission of the crime and shall continue until shall we say 5 years after the facts are brought to the attention of the proper authorities, thereby permitting prosecution." Congressman DeGraffenried agreed and further stated that "the mere fact that he is discharged at a later date and returns to civilian life ought not to free him from being prosecuted in a military court for an offense that he committed when he was in the service." *Id.* at 882. Subsequently, the original version of Article 3(a) was dropped[9] and a new provision was written and resubmitted to the subcommittee in its present form to "close up ... the *Hirshberg* loophole." *Id.* at 1262.

Well aware of Congressional dissatisfaction with the *Hirshberg* case, the draftmen of the 1951 Manual for Courts-Martial, United States, reaffirmed in this language (para. 11) these two established principles which had been enunciated by its 1928 and 1949 predecessors:

> TERMINATION OF JURISDICTION.—
> *a.* General rule.—The general rule is that court-martial jurisdiction over officers, cadets, midshipmen, warrant officers, enlisted persons, and other persons subject to the code ceases on discharge from the service or other termination of such status and that jurisdiction as to an offense committed during a period of service or status thus terminated is not revived by re-entry into the military service or return to such status. *b.* Exceptions.—To

this general rule there are, however, some exceptions which include the following:

> \*     \*     \*     \*     \*     \*

> In those cases *when the person's discharge or other separation does not interrupt his status as a person belonging to the general category of persons subject to the code,* court-martial jurisdiction does not terminate. Thus when an officer holding a commission in a Reserve component of an armed force is discharged from that commission, while on active duty, by reason of his acceptance of a commission in a Regular component of that armed force, there being no interval between the periods of service under the respective commissions, there is no termination of the officer's military status— merely the accomplishment of a change in his status from that of a temporary to that of a permanent officer—and court-martial jurisdiction to try him for an offense committed prior to such discharge is not terminated by the discharge.

(Emphasis supplied.) However, this significant provision was added to paragraph 11*b* of the 1951 Manual:

> Similarly, when an enlisted person is discharged for the convenience of the Government in order to re-enlist before the expiration of his prior period of service, military jurisdiction continues provided there is no hiatus between the two enlistments. The purpose in adding this new provision was to eliminate

any contention that *Hirshberg* had altered the prior military law governing court-martial jurisdiction. As the draftsmen of the 1951 Manual explained, there

---

**9.** That version provided (emphasis supplied): Art. 3. Jurisdiction to try certain personnel. (a) Reserve personnel of the armed forces who are charged with having committed, while in a status in which they are subject to this code, any offense against this code may be retained in such status or, *whether or not such status has terminated,* placed in an active-duty status for disciplinary action, without their consent, but not for a longer period of time than may be required for such action. The hearings indicate that Congress viewed a reservist who went off active duty as having returned to civilian life and therefore believed that he should not be subject to court-martial even though he was still a member of the reserves. Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., Index and Legislative History, Uniform Code of Military Justice, pp. 880–83 (1949). Moreover, as reflected in the limitations imposed by Article 3(a), UCMJ, 10 U.S.C. § 803(a), Congress did not want persons who had returned to civilian life to be "pull[ed] ... back into the service and away from their business for comparatively minor offenses as a harassing movement." *Id.* at 883.

was the tendency of some lawyers to read into the *Herschberg [sic]* case a proposition which was not before the Supreme Court. In the *Hirschberg [sic]* case there was a definite, although brief, hiatus. The examples in the text are cases where there is no hiatus but merely a change in particular status within the general status of being a person subject to military law. The case of persons discharged for the convenience of the Government for the purpose of reenlisting and of persons going from the status of being members of the armed force to that of persons accompanying the armed force without the territorial jurisdiction of the United States were distinguished from the *Herschberg [sic]* case by the Army Board of Review and by the Judicial Council in CM 337089, *Aikins, Seevers,* 5 BRJC 311. Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, pp. 12–13.

Thereafter, relying upon paragraph 11*b* of the 1951 Manual, this Court, by a divided vote, ruled that where no break had occurred in military status, a court-martial could try offenses committed in a prior enlistment, so long as the prosecution was not barred by the statute of limitations contained in Article 43 of the Uniform Code, 10 U.S.C. § 843. *United States v. Solinsky,* 2 U.S.C.M.A. 153, 7 C.M.R. 29 (1953); *see, e.g., United States v. Noble,* 13 U.S.C.M.A. 413, 32 C.M.R. 413 (1962); *United States v. Martin,* 10 U.S.C.M.A. 636, 28 C.M.R. 202 (1959). However, in *United States v. Steidley,* 14 U.S.C.M.A. 108, 33 C.M.R. 320 (1963), the Court moved in a different direction; and finally, *United States v. Ginyard,* 16 U.S.C.M.A. 512, 37 C.M.R. 132 (1967), repudiated the view taken by the majority in *Solinsky* and held that *"[o]nce an enlisted man has been discharged from the armed forces, that discharge operates as a bar to subsequent trial for offenses occurring prior to discharge, except in those situations expressly saved by Article 3(a) of the Code." Id.* at 516, 37 C.M.R. at 136. Consistent with this holding, the President deleted from the 1969 Manual for Courts-Martial the exception as to termination of jurisdiction which had been set forth in the 1928, 1949 and 1951 Manuals. *See* para. 11*b,* DA Pamphlet 27–2, Analysis of Contents, Manual for Courts-Martial, United States, 1969 Revised edition (July 1970).

In urging that we reexamine the question, the Government argues that *Solinsky* was right and *Ginyard* was wrong. We agree. In the first place, we believe that *Hirshberg* does not apply to an early discharge for purposes of immediate reenlistment. Hirshberg had been "granted an honorable discharge because of expiration of his prior enlistment," 336 U.S. at 211, 69 S.Ct. at 531, and the Court purported to give "great weight" to "the manner in which court-martial jurisdiction has long been exercised by the Army and Navy." *Id.* at 216, 69 S.Ct. at 533. Under the rule then prevailing Hirshberg probably would have been subject to trial by court-martial if he had been discharged before expiration of his enlistment in order to reenlist.

Secondly, in light of Congressional discontent with the consequences of *Hirshberg,* as evidenced in the hearings which led to enactment of Article 3(a), we consider that the view as to continuing military jurisdiction expressed in the 1928, 1949 and 1951 Manuals, *supra,* was more consistent with the Congressional intent at that time than was our Court's extension of *Hirshberg* beyond its facts. Indeed, several provisions of the Code seem to support the rule announced in paragraph 11*b* of the 1951 Manual and in two earlier Manuals. For example the effort in Articles 2 (10 U.S.C. § 802) of the Code and 3 to extend military jurisdiction to several classes of persons not previously covered suggests that, in situations not specifically dealt with by statute and if precedent was available to support either of two conflicting rules as to jurisdiction, the choice should be made in favor of the rule which would permit trial by court-martial. Moreover, the reference in Article 3(a) to a "person . . . in a status in which he was subject to" the Code who is "relieved from amenability to trial by court-martial by reason of the termination of that status" implies that Congress assumed that, if a

change in status had not occurred, military authorities were free to prosecute, unless the statute of limitations in Article 43 had run. Indeed, unless Congress made that assumption, there might be an embarrassing gap in the language of Article 3(a): A person who had been discharged and then reenlisted at a later time would be subject to trial by court-martial for certain offenses committed during the prior enlistment, *United States v. Gallagher, supra*; however, if a servicemember is discharged and immediately reenlists without a break in his military status, he would not fall within the ambit of Article 3(a). He has never been "relieved from amenability to trial by court-martial by reason of the termination of" his military "status", because "that status" has *not* terminated. Therefore, if *Ginyard* is good law, he cannot be tried by court-martial—an outcome which clearly was unpalatable to Congress when the Code was enacted.

Article 4(a) of the Code, 10 U.S.C. § 804(a)—a provision with origins decades before [10]—also has some relevance in determining Congressional intent when the Code was enacted. By allowing a "commissioned officer, dismissed by order of the President," to "make[ ] a written application for trial by court-martial," Congress authorized court-martial jurisdiction to be exercised over an officer, when, without his consent, it would have terminated. Likewise, the implied consent given by the servicemember to continuation of his military status when he receives an early discharge and immediately reenlists may be viewed as including his consent that he remain amenable to prosecution for offenses in the prior enlistment.

Finally, since regulations which accompany legislation are a guide to the legislative intent,[11] the very fact that the 1951 Manual for Courts-Martial—which was drafted soon after the Code was enacted and before it took effect—prescribed that military jurisdiction continued if there was no break in military status is itself persuasive in ascertaining what Congress intended at the time.

## II

Even if we acknowledge that *Ginyard* was wrongly decided, should we refrain from overruling it? Although "*stare decisis* has more force in statutory analysis than in constitutional adjudication because, in the former situation, Congress can correct our mistakes through legislation," there is no binding requirement to apply "*stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes." *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 695, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978). While appellee insists that the absence of explicit Congressional action in the intervening fifteen years constitutes an implicit ratification of our decision in *Ginyard*, we observe that during a comparable number of years Congress also failed to act to repudiate this Court's contrary ruling in *United States v. Solinsky, supra*. Of course, we attach no weight to the change in paragraph 11*b* when the 1969 Manual for Courts-Martial was promulgated, for this change was not attributable to any conscious choice by the President to retreat from the rules prescribed in the 1951 Manual, but instead merely reflected acquiescence in the *Ginyard* decision.

In suggesting that we overrule *Ginyard*, the Government claims that otherwise

---

**10.** As noted by Colonel Winthrop, the "provision was originally enacted in s[ection] 12 of the Act of March 3, 1865, c. 79. *Military Law and Precedents, supra* at 64. *See* Article 37 of the Articles for the Government of the Navy; para. 38(b), Manual for Courts-Martial, the 1917 and 1921 editions.

**11.** *See United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 718–19,

95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975); *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 420–21, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973); *Power Reactor Development Co. v. International Union of Electrical Radio and Machine Workers, AFL–CIO*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961).

we will deter use by the armed services of early discharges for purposes of immediate reenlistment and instead there will be reliance on extension of existing enlistments. However, we doubt that our decision will be a decisive factor in determining what personnel procedure to use. Moreover, the argument cuts both ways, since the availability of an alternative personnel procedure diminishes the need to overrule our erroneous decision in *Ginyard.*

We believe, however, that the 1979 amendment to Article 2 of the Uniform Code, 93 Stat. 810, does constitute an intervening expression of Congressional intent that warrants overruling *Ginyard*, and returning to the rule announced in paragraph 11*b* of the 1951 Manual. Article 2(b) now refers to "a change of status from civilian to member of the armed forces" and the new Article 2(c) further states that one who has enlisted under the conditions there set forth is subject to military jurisdiction "until such person's active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned." The reference to "change of status" is significant because it displays a concern with military status, rather than with completion of a particular enlistment. The reference to termination of "active service" —rather than to receipt of a discharge—is also important since the person who is discharged before the expiration of his term of enlistment for purposes of immediate reenlistment has experienced no termination of—and no hiatus in—his "active service." He has remained continuously in "active service" at all times, despite his receipt of a discharge from the prior enlistment. Indeed, during oral argument, we were informed that under current Army practice, a soldier discharged early to reenlist immediately will not receive the same discharge certificate that he would be issued if discharged upon the expiration of an enlistment.[12]

Basically, the 1979 amendment to Article 2 of the Code reflects a Congressional intent to focus on military status as the touchstone for court-martial jurisdiction and to eliminate objections to such jurisdiction because of recruiter misconduct which helped induce the enlistment contract. It would be inconsistent with that intent for our Court to leave in effect an erroneous decision which—apparently on the grounds that a discharge constitutes a waiver of military jurisdiction—now precludes trial by court-martial for offenses in a prior enlistment, even though no interruption in military status has occurred.

While we now overrule *Ginyard*, we do not question that under *Hirshberg* military jurisdiction is terminated by a discharge *at the end* of an enlistment or period of obligated term of service even though the servicemember immediately reenters the service.[13] This break in "status," irrespective of the length of time between discharge and reenlistment, is sufficient to terminate jurisdiction.

## III

■ Since we are overruling an earlier decision of our Court, we must consider whether that overruling should only be prospective in nature. Ever since 1951, Article 3(a) of the Code has given notice that a discharge may not terminate amenability to trial—at least, when the former servicemember resumes his military status. Therefore, we perceive little likelihood that servicemembers have accepted early discharges for the purpose of immediate reenlistment in order to prevent trial for offenses committed in the earlier enlistment. Instead, we believe that in most instances discharges for purposes of immediate reenlistment have been induced by financial benefits that were available under such circumstances. Even so, to avoid any danger that there may have been some type of detrimental

---

12. Moreover, a "discharge certificate will not be delivered to the member until after enlistment/reenlistment is accomplished." Para. 5–9, Army Regulation 635–200 (21 Nov. 1977).

13. Of course, if jurisdiction over the offense is saved by Article 3(a), a different result would obtain.

reliance [14] on *Ginyard*, we shall only overrule the case prospectively with respect to those reenlistments occurring after the date of our mandate in this case.

After setting aside the findings of guilty on the two worthless check specifications, the Court of Military Review reassessed the sentence; after reassessment, it affirmed the sentence. Accordingly, there is no need to disturb that action. The decision of the United States Army Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (concurring in the result):

In the present case, the majority affirms the decision of the Court of Military Review setting aside the findings of guilty of two specifications. I agree with this action and also vote to affirm the decision of the Court of Military Review. I do not agree with the prospective jurisdictional rule established in this case for the reasons stated below.

At the outset, I would note that this case does not embrace constitutional problems similar to those encountered by the Supreme Court in *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Nevertheless, it does raise an important question concerning the statutory jurisdiction of courts-martial as authorized by the Uniform Code of Military Justice. *See United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949); *Runkle v. United States*, 122 U.S. 543, 7 S.Ct. 1141, 30 L.Ed. 1167 (1887). In addressing this question, the majority overrules an earlier decision of this Court in *United States v. Ginyard*, 16 U.S.C.M.A. 512, 37 C.M.R. 132 (1967). In so doing, I believe that it rewrites Article 2, Uniform Code of Military Justice, 10 U.S.C. § 802 and partially abrogates Article 3(a), UCMJ, 10 U.S.C. § 803(a). In my opinion, such legislative activity is the responsibility of Congress. *See* U.S.Const., Art. I, § 8, cl. 14.

The majority first asserts that the Supreme Court's *Hirshberg* decision is not applicable to the accused's situation of an early discharge and reenlistment prior to the expiration of the term of the original enlistment. It points out that "Hirshberg had been 'granted an honorable discharge because of expiration of his prior enlistment'" and he was reenlisted one day later. 13 M.J. 308, 314.

Such a factual distinction does exist. Yet, the conclusion drawn by the majority ignores the broader principle of interpretation of jurisdictional statutes espoused in the case. In *Hirshberg*, the Supreme Court expressly rejected the Government's argument that Article 8 of the Articles for the Government of the Navy and its words "in the Navy" should be interpreted to include a person who reenlisted after discharge but not include a person who did not reenlist after discharge. Such a distinction was considered "whimsical and uncertain." 336 U.S. at 213, 69 S.Ct. at 532. The Supreme Court stated: "Jurisdiction to punish rarely, if ever, rests upon such illogical and fortuitous contingencies." *Id.* at 214, 69 S.Ct. at 532.

The majority today in interpreting Article 2(a) makes an even more whimsical distinction based on the fortuitous circumstance of the time of reenlistment. Absent express language in the statute, such a statutory interpretation should also be barred by the general jurisdictional principle articulated in *Hirshberg*.

The majority, in the alternative, asserts that if the rationale of *Hirshberg* was applied to the accused's situation, jurisdiction would nonetheless be sustained by the Supreme Court. It points out that the Supreme Court, in finding no jurisdiction in *Hirshberg*, "purported to give 'great weight' to 'the manner in which court-martial jurisdiction has long been exercised by the Army and Navy.'" 13 M.J. at 311.

---

**14.** *Cf. Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959).

Two problems exist with such an assertion. First, in *Hirshberg*, the Supreme Court recognized that since 1932 the Navy had considered Article 8, A.G.N., to confer jurisdiction over a person who remained in the service after discharge. *See* § 334, Naval Courts and Boards, 1937. In the present case, the practice relied on by the majority belatedly began in 1917. I fail to see any material difference between the two cases on this basis which would lead to a different result. Second, in *Hirshberg*, the longstanding practice of the service was used to support a finding of no jurisdiction. The majority today employs the practice of the services as embodied in paragraph 10, Manual for Courts-Martial, U.S. Army (1928) and 1949 and paragraph 11, Manual for Courts-Martial, United States, 1951, to find jurisdiction. The Supreme Court, however, did address the question of expansion of court-martial jurisdiction in this manner in *United States ex rel. Hirshberg v. Cooke, supra* at 218, 69 S.Ct. at 534:

> we are not able to agree that the Navy could in this manner acquire the expanded court-martial jurisdiction it claimed. For we cannot construe 34 U.S.C. § 591, 34 U.S.C.A. § 591, as permitting the Navy to extend its court-martial jurisdiction beyond the limits Congress had fixed.

For this reason, I conclude jurisdiction would not be sustained by the Supreme Court which decided *Hirshberg*.

The majority's second argument for overruling the decision of this Court in *United States v. Ginyard, supra*, rests on its assessment of the intent of Congress in enacting Article 3(a). It asserts that the language of this provision, in particular the words, "termination of that status," reflects the fact that Congress intended mere changes of status such as reenlistment prior to discharge to be covered by Article 2.

The purpose of this enactment is best explained in a concise manner in a letter from Senator Millard E. Tydings, then Chairman of the Senate Armed Services Committee, in answer to a letter from Senator Pat McCarran and introduced into the Congressional Record during the floor debate on the Uniform Code of Military Justice. That part of the letter pertaining to Article 3(a) is as follows:

> Article 3 of the code provides, in general, for a continuing jurisdiction under certain circumstances where jurisdiction has previously attached and was segregated from article 2 for that reason, even though as you pointed out, it generally covers the question of jurisdiction. The problem encountered in connection with this article, and particularly subdivision (a) of it, concerns those types of situations where persons have committed offenses while serving on active duty in the armed services and who, thereafter, by virtue of some artificial situation, are unable to be tried either by courts martial or the Federal courts. In general, the classes of cases fall into three categories:
>
> (1) Reservists who go on inactive duty; (2) persons who are discharged from the service; and (3) persons who, although once discharged, reenter the service. A number of cases falling into these categories have taken place, and it has been found that no jurisdiction resides in any court to bring them to trial.... The alleged acts, of course, occurred overseas, outside the jurisdiction of the Federal courts. The question of whether or not the Navy had jurisdiction to try him for these charges, where the discharge intervened—even though he was out of the service for 1 day only—was settled by the Supreme Court, which held that the Navy had lost jurisdiction by virtue of the discharge. Under these circumstances, no court—military or civilian—had jurisdiction to determine whether or not Hirshberg had committed a serious offense. I think it is noteworthy to point out that the Supreme Court's decision was based entirely on a lack of statutory authority and specifically did not involve a constitutional question.
>
> . . . .
>
> It was for the purpose of covering cases of this type, over which there is no present jurisdiction, that article 3(a) was drafted. It seems entirely fair that,

within the statute of limitations, persons who have committed offenses should not gain an immunity or be excused by virtue of the administrative act of going off active duty or being separated from the armed forces. However, it was not intended to extend blanket jurisdiction over cases of this time, or to convey to military courts jurisdiction under these circumstances over every trivial offense. For that reason, the jurisdiction is limited to serious crimes only by virtue of the provision that the offense must call for a sentence of at least 5 years. In addition, it was felt that where the Federal or State courts have jurisdiction, such jurisdiction should not be disturbed, and there would be no justification in also giving it to the courts martial. For that reason, it is provided that the courts martial are to have jurisdiction only if the civil courts do not have it.

96 Cong.Rec. 1367 (1950).

In my opinion, discharge prior to expiration of enlistment and reenlistment is one of the "artificial situation[s]" Congress attempted to remedy in Article 3(a). Article 2 lists various military statuses a person may be in which render him subject to the Code. Accordingly, Article 3(a) was designed to permit court-martial jurisdiction to continue under certain circumstances where the person's original military status was terminated and he entered a new military status mentioned in Article 2. *See United States ex rel. Toth v. Quarles, supra.* Rather than creating a gap as suggested by the majority, the statute ensures equal treatment of reenlisted service members. *See* 10 U.S.C. 1171.

The majority's third argument, based on Article 4(a), is specious. Congress spoke specifically in that Article to a particular situation involving officers. Accordingly, any inference drawn from it concerning an enlisted member under Article 2 is unsupported.

The majority's fourth argument is unpersuasive for the reasons stated earlier that the services may not unilaterally expand court-martial jurisdiction beyond that expressly fixed by Congress.

Section II of the majority opinion betrays the majority's lack of confidence in its earlier analysis of Article 2. It first suggests that Article 2(b), 93 Stat. 810 (1979), reflects an intent by Congress to return to the rule announced in paragraph 11*b* of the 1951 Manual for Courts-Martial. There is no hint of such an intent in the legislative history of this provision. Moreover, the words "change of status" do not stand alone in Article 2(b), but are expressly limited to the "change of status from civilian to member of the armed forces." This problem is materially different from the majority's assertion that appellee's status once properly obtained in the military never terminated. 10 U.S.C. § 1168; *see* Article 3(a).

The majority also relies on Article 2(c) and the words, "active service," to conclude that *United States v. Ginyard, supra,* must now be overruled. The position, as I perceive it, is that where a service member is discharged prior to expiration of his enlistment and then is reenlisted, there is no termination of—and no hiatus in—his "active service." Apparently, the majority is now concluding that jurisdiction to try appellee exists under Article 2(c) rather than Article 2(a).

The legislative history of Article 2(c) lends no express support to the majority's statutory analysis. In fact, it reveals a general intent to eradicate confusion over the doctrine of constructive enlistment where a formal enlistment is found defective. *See United States v. Russo,* 1 M.J. 134 (C.M.A.1975); *United States v. Brown,* 23 U.S.C.M.A. 162, 48 C.M.R. 778 (1974); *United States v. Catlow,* 23 U.S.C.M.A. 142, 48 C.M.R. 758 (1974); *United States v. Overton,* 9 U.S.C.M.A. 684, 26 C.M.R. 464 (1958). In the accused's case, there was no question that his original enlistment, discharge, and reenlistment were all valid, and therefore no need exists to rely on this provision for court-martial jurisdiction. If the majority's interpretation was correct, both Article 2(a) and 2(b) could in large part have been eliminated.

In addition, Article 2(c) states that court-martial jurisdiction exists over such persons "until such person's active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned." In my opinion, 10 U.S.C. § 1168 provides for termination of active service of a member of the regular army. It states:

§ 1168. Discharge or release from active duty: limitations

(a) A member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or a substantial part of that pay, are ready for delivery to him or his next of kin or legal representative.

In addition, Congress provided in 10 U.S.C. § 508, that a person so discharged might be reenlisted. The provision states:

§ 508. Reenlistment: qualifications

(a) No person whose service during his last term of enlistment was not honest and faithful may be reenlisted in an armed force. However, the Secretary concerned may authorize the reenlistment in the armed force under his jurisdiction of such a person if his conduct after that service has been good.

(b) *A person discharged from a Regular component may be reenlisted in the Regular Army, Regular Navy, Regular Air Force, Regular Marine Corps, or Regular Coast Guard, as the case may be, under such regulations as the Secretary concerned may prescribe.*

(Emphasis added.)

(c) This section does not deprive a person of any right to be reenlisted in the Regular Army, Regular Navy, Regular Air Force, Regular Marine Corps, or Regular Coast Guard under any other provision of law.

Congress also provided in 10 U.S.C. § 1171, for early discharges of regular enlisted members. The provision states:

§ 1171. Regular enlisted members: early discharge.

Under regulations prescribed by the Secretary concerned and approved by the President, any regular enlisted member of an armed force may be discharged within three months before the expiration of the term of his enlistment or extended enlistment. *A discharge under this section does not affect any right, privilege, or benefit that a member would have had if he completed his enlistment or extended enlistment, except that the member is not entitled to pay and allowances for the period not served.*

(Emphasis added.)

Finally, Army Regulations provide in paragraph 5–9, AR 635–200 (21 Nov. 1977), a more particular discussion of this termination of active service:

5–9. *Discharge for the purpose of immediate enlistment or reenlistment.* Enlisted personnel who are accepted for enlistment/reenlistment as set forth below will be discharged for the convenience of the Government. Members so discharged will be enlisted/reenlisted on the day following discharge. The discharge certificate will not be delivered to the member until after enlistment/reenlistment is accomplished.

a. Unit commanders are authorized to order discharge for reenlistment under the provisions of AR 601–280.

b. Commanders responsible for US Army reception station processing are authorized to discharge members to enlist for warrant officer flight training.

Consistently construing Article 2(c) in view of these statutes and regulations as well as other provisions of the Uniform Code of Military Justice, I find the majority's final argument unpersuasive.

In my opinion, if court-martial jurisdiction existed to try appellee on these two specifications, it must be found in Article 3(a). Since these offenses were clearly punishable in a federal or state court, I find that Congress did not intend that they be tried by court-martial. As lamentable as this result may be, I am constrained to advise the services to make the case for

military discipline and expansion of court-martial jurisdiction under these circumstances before the proper legislative body, Congress.[1]

1. *E.g.*, Woodruff, *The Rule in Ginyard's Case-Congressional Intent or Judicial Field Expedient?*, 21 A.F.L.Rev. 285, 325–29 (1979).